UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal No.: 92-0054 (RMU) |
| | : | |
| v. | : | |
| | : | Sentencing:    September 5, 2006 |
| WILLIAM WILLIS | : | |
| | : | |
| Defendant. | : | |

GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

_____The United States of America, by and through its attorney, the United States Attorney for

the District of Columbia, respectfully submits this Memorandum in Aid of Sentencing for the

Court's consideration:

I.    BACKGROUND

    A.    Procedural History

On February 6, 1992, in case number 92-0054, defendant William Willis was charged in a

nine count indictment with one count of Conspiracy to Commit Bank Fraud, in violation of 18

U.S.C. § 371, and eight counts of Bank Fraud, in violation of 18 U.S.C. § 1344.  That same day,

United States Magistrate Judge Alan Kay issued a bench warrant for defendant's arrest.

Defendant Willis remained a fugitive until on or about November 6, 2004, when he was

arrested in Arizona.  Thereafter, United States Magistrate Judge David K. Duncan of the United

States District Court for the District of Arizona released defendant Willis on a personal recognizance

bond after ordering Willis to appear before Judge Kay in Washington, D.C. on Monday, November

29, 2004.

On November 29, 2004, defendant Willis appeared as ordered before Judge Kay and was

arraigned on the pending nine count indictment in criminal case number 92-0054.  Defendant Willis

entered a plea of not guilty as to the charged offenses and was released on an unsecured appearance bond of $100,000.

Following a motions hearing on April 4, 2005, the Court granted defendant Willis's motion to dismiss four of the eight counts of Bank Fraud. As a result, defendant Willis remained indicted on one count of Conspiracy to Commit Bank Fraud and four counts of Bank Fraud.

On April 4, 2005, defendant Willis signed a notice to return to Court on three separate dates: on September 1, 2005, for a pretrial hearing; on September 16, 2005, for jury selection; and on September 19, 2005, for trial.

On August 2, 2005, the Court issued an order in which it rescheduled defendant's September 1, 2005, pretrial hearing for September 6, 2005. Thereafter, on September 1, 2005, the Court again rescheduled defendant's September 6, 2005 pretrial hearing for September 8, 2005. Thereafter, defendant failed to appear as ordered for: (1) his pretrial hearing on September 8, 2005; (2) jury selection on September 16, 2005; and (3) his trial on September 19, 2005.

The Court issued a bench warrant for defendant's arrest on September 13, 2005. The same day, the government filed a retyped indictment which omitted dismissed counts two through five, and renumbered the remaining Bank Fraud counts, formerly counts six through nine, as counts two through five.

On or about October 4, 2005, defendant Willis was arrested in Atlanta, Georgia. Thereafter, on October 20, 2005, defendant appeared before United States Magistrate Judge Deborah A. Robinson and was held without bond pending a status conference before the Court on November 1, 2005.

In the meantime, on October 18, 2005, an indictment was filed in criminal case number 05-384 charging defendant with three counts of Failure to Appear While on Pretrial Release, in violation of 18 U.S.C. § 3146(a)(1). The new charges stemmed from defendant's failure to appear as ordered in September 2005 for his preliminary hearing, jury selection and trial in criminal case number 92-0054.

A status conference was held before the Court on November 1, 2005. At that hearing, the Court granted the government's oral motion to join the Failure to Appear charges in criminal case number 05-384 with the pending charges in criminal case number 92-0054. The Court subsequently scheduled jury selection for defendant's trial for Friday, March 10, 2006, and defendant's trial for Monday, March 13, 2006.

On Friday, March 10, 2006, a jury was selected to hear defendant's trial. Thereafter, on Monday, March 13, 2006, defendant entered a guilty plea to a total of three counts. In criminal case number 92-0054, defendant Willis pled guilty to one count of Conspiracy to Commit Bank Fraud, in violation of 18 U.S.C. § 371, and one count of Bank Fraud, in violation of 18 U.S.C. § 1344. In criminal case number 05-384, defendant pled guilty to one count of Failure to Appear While on Pretrial Release, in violation of 18 U.S.C. § 3146(a)(1). Defendant Willis's sentencing hearing is set for September 5, 2006.

B.     **Defendant's Fraudulent Scheme**

Defendant Willis committed the fraud to which he has pled guilty through a company he founded as Champagne Productions, Incorporated ("CPI"). Willis was the president and chief operating officer of CPI. CPI was purportedly an automobile buying and leasing corporation. Its primary offices were located at 600 Water Street, Southwest, Washington, D.C.

From 1983 through 1987, Willis recruited people to "invest" in CPI by serving as "straw purchasers" for the company, providing their personal information to obtain credit for automobile loans. Willis would often cause the straw purchasers to make materially false representations on the loan applications, concerning their income, job status, credit history, references, liabilities, and other financial information. In some instances, Willis created or directed others to create phony W-2 forms and other fraudulent documents to submit with the credit applications. Willis would also cause the straw purchasers to represent falsely to the financial institutions that the cars they were financing would remain in the possession of the straw purchasers. In fact, Willis took immediate possession of the cars in order to transfer them to various third parties who could not or did not want to obtain financing in their own names. While CPI had some legitimate customers, particularly in the early years of its operation, its primary customers were drug dealers who were unable to obtain financing due to their lack of legitimate income and who wanted the anonymity of driving vehicles that were registered in others' names. Willis thus helped launder drug proceeds in addition to providing vehicles to drug dealers that were financed by his associates. He also deprived the lending institutions of the collateral that CPI had fraudulently guaranteed would secure their loans to the straw purchasers.

Willis's greed ultimately caused the business to collapse. Willis was accepting large amounts of cash from drug dealers at the time that CPI financed and obtained the cars that they wanted. For example, Willis unlawfully laundered money for Rayful Edmond, a notorious drug dealer who was later arrested, in 1989, and is now serving two life terms of imprisonment. Edmond obtained several cars from Willis, each in the same manner. He would contact Willis and tell him what car he wanted and Willis would quote him a price – typically thousands of dollars more than the sale price of the car, so that Willis could make a profit. Edmond was willing to pay the premiums for several reasons. First, he had thousands and thousands of dollars in cash, and Willis allowed him to pay in cash with no fear that the transaction would be reported. Second, he did not want anything in his name, in order to avoid detection by law enforcement. Third, he wanted to avoid going to a dealer himself. For most of the cars that Edmond obtained from Willis, he paid Willis somewhere between $50,000 and $60,000 in cash, per car. Willis would find a straw borrower who was willing to provide his or her credit information, and would then submit paperwork to obtain financing for the car. The paperwork often contained false information about the straw borrower's income, employment, and other obligations, as the straw purchasers Willis used were typically not qualified for loans for the cars that Edmond and other drug dealers wanted. After obtaining the car, Willis would turn over the car to Edmond. Willis made small down payments on the cars, and in theory, CPI was supposed to make payments on the balance owed to the lending institutions. As explained more fully below, however, Willis was spending the cash that he took from the drug dealers, leaving no assets in CPI to pay off these balances.

Willis's business was already failing when the FBI executed a search warrant at CPI's offices on March 16, 1987. Among the documents that were recovered was a handwritten list, created by

Willis's former associate at CPI, Kurt Johnson, with the assistance of CPI's general manager, Carl Madison.  That list, entitled "Advance Payments," is attached as Exhibit One to this memorandum. The list represents Kurt Johnson's attempt to account for all of the CPI cars that had payments owed to the lending institutions but had been prepaid by the customer.  The first column identifies the customer for whom the car was obtained; the second column lists the year and make of the car; the third column shows the monthly payment due to the lending institution from CPI on the car; the fourth column shows the amount due from the customer named in the first column; the fifth column shows the amount paid in advance; and the final column shows the total amount outstanding on the loan for the car.

For example, the first car on the list is a 1985 Cressida that was obtained for James Smith and paid in full by Smith, a significant heroin seller in the 1980's who is now serving a 30-year sentence on federal drug charges.  Smith paid Willis in cash for that car and many others on the list; in addition to the several cars listed to Smith, many of the cars with no identified customer were also obtained for Smith.  As reflected on the list, despite the fact that Smith paid Willis in full for the cars, this money was not paid to the financial institutions, so many payments were still owed on these cars.

The last page of Exhibit One is a copy of an adding machine printout that Johnson prepared adding up all of the amounts owed on CPI's cars from the last column of the list.  The first total, $997,479.40, represents the total outstanding amount owed on all of the cars on this list.  Johnson subtracted from that amount the amounts due from customers, reaching a revised amount owed of $919,979.40, which is the amount CPI would have owed assuming that the customers made their payments to CPI.  The revised total of $919,979.40 shows that the vast majority of the cars CPI

6

obtained for customers were paid in full in advance – which was of course the preferred method for wealthy drug traffickers seeking to launder their cash. In other words, this list reflects that Willis had accepted $919,979.40 in cash that was never paid out on CPI's cars. (Some payments had been made, so the amount of cash that Willis took was well over a million dollars.)

At the time he prepared this list, on February 27, 1987, Johnson was becoming very concerned about CPI's financial situation. Johnson was unaware of any significant CPI accounts from which payments on this large sum could be made. His concerns were justified, as it later became clear that Willis had spent nearly all the cash that had been paid to CPI. Johnson informed investigators that after he prepared this list, he discussed it with Willis, who tried to assure him that it would all work out.

As the Court now knows, it did not all work out. Several weeks after Johnson prepared this list, the FBI executed its search warrants. At the time the search warrants were executed and in the days immediately following, Willis continued to assure Johnson and others that the company was not in any trouble, trying to reassure them by telling them that the FBI was investigating some of CPI's customers. Willis clearly knew better, however, as he soon thereafter left town and could not be located – by the FBI, by his former employees and associates such as Johnson, or by the customers, whose cars were being seized by the banks because payments remained outstanding.

## C. **Impact of CPI's Fraud on Other Participants**

The following is a brief summary of the roles of some of the other participants in Willis's business at CPI. His associates there were rarely salaried, but rather received "commissions" of up to several thousand dollars for each car they signed for. All of the others who were charged for their roles in the CPI scheme pled guilty more than ten years ago to their participation in the conspiracy.

When Willis left the area, those of his associates who had signed for cars that were not paid for by CPI were left with significant debts; many were sued and either settled lawsuits or agreed to pay off the amounts they owed.  No one could locate Willis.

1.    **Carl Madison**.  Carl Madison was the manager of CPI and Willis's right-hand man. He signed for numerous cars and was left with significant credit problems after Willis left the area. Moreover, a number of the drug dealers sought out Madison and demanded to know why their cars were being repossessed when they had paid Willis in full for the cars.  Madison signed a plea agreement in 1989 and agreed to plead guilty to one count of Conspiracy to Commit Bank Fraud and Wire Fraud, one count of Wire Fraud, and three counts of Bank Fraud, based on his participation in the conspiracy with Willis.  Madison agreed to cooperate and did cooperate in the investigation, and was sentenced to four years' imprisonment.

2.    **Kurt Johnson**.  Kurt Johnson worked with Willis at CPI for several years.  He received no salary, only "commissions."  He signed for seventeen cars, many of which had significant unpaid balances on their loans when Willis left the area.  None of the cars were in Johnson's possession, and Johnson did not have the relationships with the CPI customers that would have allowed him to demand that the cars be returned to the lenders.  Johnson suffered significant problems with his personal credit as a result of his involvement with CPI.  He felt that it was his responsibility to pay off the loans, and thus decided not to declare personal bankruptcy.  He therefore agreed  to make payments over time to the lending institutions to settle his debts on the cars.  Johnson paid off the last of these loans in 2003.  Over the sixteen years that he made payments, he estimates that he paid a total of more than $120,000 to the institutions that lent him money as a straw borrower for CPI.  Johnson signed a plea agreement in 1987 and agreed to plead

guilty to one count of Conspiracy to Commit Bank Fraud and two counts of Bank Fraud. Johnson was sentenced to probation with community service, which he completed successfully. He is now self-employed in a consulting business.

3.    **Barrajean Holliday.** Barrajean Holliday was listed in the initial incorporation papers for CPI as the Secretary-Treasurer of the company (Willis was listed as President and Carl Madison as the Business Manager). He was involved in the CPI scheme for several years, and acted as a straw borrower for Willis and CPI on ten occasions. Holliday signed a plea agreement in 1988 agreeing to plead guilty to one count of Conspiracy and two counts of Bank Fraud. He agreed to cooperate with the ongoing investigation and was ultimately sentenced to a term of probation with community service.

4.    **Joe Reed.** Joe Reed signed for five cars for Willis and CPI over the course of a six-month period in 1986. He signed a plea agreement in 1987 and pled guilty to one count of Conspiracy and one count of Bank Fraud. He also agreed to cooperate with the ongoing investigation. He was ultimately sentenced to a term of probation with community service, which he completed successfully.

5.    **Mary Woodard.** Mary Woodard worked for several years as a secretary at CPI. She signed for eight cars for Willis and CPI during that time. Several of the cars were financed for James Smith, who paid off his portion of the outstanding loans when Willis left the area. Woodard was sued by some of the lenders who were not paid, and had to pay about $20,000 from her own funds in order to settle those outstanding debts. She signed a plea agreement in 1987 and pled guilty to one count of Bank Fraud. Woodard was sentenced to a term of probation and community service, which she completed successfully.

6.      **Lori Rones.**  Lori Rones also worked as a secretary for CPI, for a short period of time.  She signed for ten cars for Willis and CPI.  When Willis left town, Rones still had outstanding debts from the cars she had signed for.  James Smith agreed to pay off one of the cars that he had obtained from CPI in order to protect Rones from action by the bank.  For the others, Rones had to pay off the outstanding loans.  She was young at the time, so her parents helped make payments so that she would not be sued by the lenders.  Rones signed a plea agreement in 1988 agreeing to plead guilty to one count of Bank Fraud and agreeing to cooperate in the ongoing investigation.  She was ultimately sentenced to a term of probation and community service.

7.      **Charles Kirk**.  Charles Kirk was an elementary school teacher who agreed to sign for three cars that Willis obtained for CPI customers.  He was never employed at CPI and did not have sufficient involvement or understanding of Willis's scheme to be held accountable by a guilty plea.  Nonetheless, Kirk was among those who was sued by lenders after Willis left the Washington area and failed to make payments on the cars Kirk had signed for.  The debts ruined his credit; for a period of twelve years, Kirk was unable to purchase a home, and his wife had to purchase their personal cars in her name.

8.      **Others**.  The foregoing list includes fewer than half of the straw purchasers who signed for cars for Willis and CPI.  Because these persons signed for cars that were charged in the Indictment, the government has interviewed them in preparation for trial and is aware of their circumstances.  There were more than one hundred cars obtained for CPI customers during the course of Willis's scheme, the vast majority of which were not included in the Indictment.  Thus, this list provides only a partial account of the harm caused by Willis's scheme at CPI.

### D.  <u>Willis's Response to CPI's Collapse and the FBI's Investigation</u>

At the time that Willis finally entered his guilty plea in this case, on the morning that opening statements were to be delivered to the jury, he claimed that he wanted to accept full responsibility for the failures of his company and expressed remorse for the mistakes he had made.  He even claimed that he had wanted to do so all along.  These professed sentiments are completely hollow. Nothing could be more inconsistent with them than his actions from 1987 through the entry of his guilty plea.

Willis lived a lavish lifestyle in the 1980's, but left the Washington area when he knew that his company was failing and the FBI had learned of his criminal scheme.  He abandoned all of his coconspirators, as well as the innocent persons he had enlisted to participate in CPI's fraud, leaving them liable for the massive debts that he had incurred through CPI.  He had spent nearly all of the money that he had taken from the drug dealers who obtained cars through CPI.  With their cash, he bought a huge home in Maryland that he used to entertain his friends and customers.  <u>See</u> Government's Exhibit Two.  He obtained expensive cars for his own use, and purchased cocaine for his own consumption and for those he entertained.  He purchased a boat that he docked outside the CPI offices and used to throw parties for his friends and customers.  <u>See</u> Government's Exhibit Three (Willis's boat is one of those docked at the end of the pier behind the building; CPI's offices occupied a suite on the second floor).  There was no cash left in CPI's accounts after Willis fled the area.

The government is now aware that as early as 1991, Willis was living under different names in the Los Angeles area of California.  <u>See</u> Government's Exhibits 4-9 (six California identification cards in five different names, all bearing Willis's photograph).  A preliminary investigation into

11

Willis's activity in California and Arizona uncovered numerous witnesses who played similar roles to the CPI straw purchasers, signing for cars that Willis turned over to others whom the straw purchasers did not know. As outlined in the government's motion for the admission of 404(b) evidence, Willis used other people's credit to obtain at least ten cars and a boat for his and others' use. He also purchased, using the names and credit information of two women who are now trying to force him to help pay off their debts, a vacation-type home in Arizona. <u>See</u> Government's Exhibit Ten (Willis with friends on back patio of that Arizona house). Photographs seized from that home show Willis leading a carbon copy of the lavish lifestyle that he led in Washington in the 1980's, complete with expensive cars and a boat. <u>See</u> Government's Exhibits Eleven (Willis next to his Cadillac Escalade) and Twelve (Willis's friends next to his boat). We invite the Court to consider whether the lifestyle that these photographs illustrate is consistent with someone who has remorse for his illegal conduct. Quite the contrary: Willis never cared a bit for his former DC friends and associates – whose credit problems and felony convictions resulted from their association with him – while he engaged in similar fraudulent activity in another part of the world. The harm Willis has caused to friends and associates who signed for cars and real estate property for Willis in California and Arizona is under preliminary investigation, but appears to be very similar to the harm that is described above.

###    E.    <u>Flight from Prosecution</u>

Willis did not accept responsibility for his crimes until the last possible moment. After being arrested in Arizona in 2004 for these charges, Willis persuaded the Court that he would report voluntarily to face the charges against him. In August 2005, however, with his September, 2005, trial date approaching, Willis made plans to flee to Atlanta. His flight was not a last-minute act of

panic. The government has evidence that friends were assisting him in the beginning of August in finding a place to live in Atlanta where he could assume another false identity and avoid trial on these charges.

At one point, after Hurricane Katrina devastated the New Orleans area and local authorities were attempting to assist people who had lost all of their belongings, Willis suggested to friends that he might travel there and take advantage of this assistance to assume a new identity. (The government has a recorded telephone call between Willis's associates in which they discuss Willis's plans to do this, and we can provide a copy of this call to defense counsel or the Court upon request.) Willis was inclined to take advantage of the government in this manner just as he has taken advantage of others his entire life. Willis must now finally learn that it is time for him to face punishment for the crimes he has committed and the harm he has caused to others.

II.    **SENTENCING RECOMMENDATION**

The government believes that Willis deserves a significant sentence in this case. He has shown no remorse and can only truly appreciate the wrongfulness of his conduct and the harm he has caused to others if he spends a considerable amount of time in jail.

A.    **Imprisonment**

Willis pled guilty to two counts from the 1992 indictment, each of which carry a maximum penalty of five years. Under the pre-Guidelines sentencing scheme, which applies to these charges, defendants are eligible for parole upon completion of one-third of their sentences, and a nonviolent defendant such as Willis would almost certainly be paroled at that point. A sentence of five years on each of these counts, to run consecutive to one another, would therefore result in Willis ultimately serving a little more than three years on these charges. This sentence is hardly enough

for Willis; anything less than imprisonment for three and one-third years would be inequitable to his co-conspirators who pled guilty and accepted responsibility years ago. Moreover, a lesser punishment would reward him for his flight; he should be punished more severely than those participants who accepted responsibility and served their punishments more than fifteen years ago.

By statute, the sentence for failure to appear should run consecutive to the sentences for the underlying offense. 18 U.S.C. Section 3146(b)(2). We recommend that Willis receive the maximum sentence within the Guideline range for this offense, or a sentence of twelve months' incarceration. The defendant's failure to appear for trial in September, 2005, was not the first time that he fled from justice. When he left the Washington area in 1987, he was well aware that the FBI was investigating his business and his criminal activities would soon be exposed. As FBI Special Agent Janet Butkus's April 6, 2005, testimony in the motions hearing demonstrated, the FBI made numerous contacts with Willis's close relatives in an effort to locate him. In preparation for trial, we have confirmed that Willis's aunt informed him that the FBI was looking for him. Nonetheless, Willis did not turn himself in, but was finally caught when he was stopped for a traffic offense and had no identification in another name to present to the authorities. The seventeen-year flight from justice – from soon after the 1987 search of CPI's offices until his arrest in Arizona in the fall of 2004 – should be considered as an aggravating factor in determining the appropriate sentence for his failure to appear for trial in this case. That flight is even further aggravated, of course, by his later flight to Atlanta and failure to appear for trial. For these reasons, the government believes that the maximum sentence within the Guideline range is justified.

### B.    <u>Restitution</u>

Willis has never been held financially accountable for the fraud he committed through CPI. The government therefore believes that he should be required to pay a substantial monetary penalty. Because many of Willis's coconspirators, and several individuals who were not part of the conspiracy, had to pay CPI's debts from their own funds and were therefore harmed by his conduct, we believe that general restitution through compensation to the Victims of Crime Fund would be appropriate.

The Presentence Report lists eleven financial institutions as victims in this case. As described above, these financial institutions recouped some of their losses from Willis's coconspirators. Many of these institutions have since been bought by larger banks and all have long since written off any losses that were not paid off by Willis's coconspirators and others who signed for CPI's cars. We therefore do not believe that restitution to these institutions is needed.

Instead, we believe Willis should be required to pay a substantial restitution payment to the Crime Victims Fund. Indeed, we see no other way to ensure that Willis refrains from starting another fraudulent scheme once he is released. Without such an obligation, Willis will leverage any funds he can get his hands on in another fraudulent scheme and will end up once again with expensive cars, boats, and homes in others' names, creating more victims. We recommend a payment of $5,000 for each car in the Indictment, for a total of $70,000, which is only a fraction of the total loss amount caused by his fraud and is not an unreasonable amount to require him to pay when he is released.

WHEREFORE, the government respectfully requests that the Court impose a sentence of five years for the count of conspiracy; five years for the count of bank fraud; and a sentence of

twelve months for the failure to appear, each sentence to run consecutive to the others, followed by

three years of supervised release, and restitution in the amount of $70,000.

Respectfully submitted,

KENNETH L. WAINSTEIN
UNITED STATES ATTORNEY


_____
DAVID C. WOLL
AMY JEFFRESS, D.C. Bar 449258
ASSISTANT UNITED STATES ATTORNEYS
555 4th Street, N.W., Room 4104
Washington, D.C. 20530
(202) 514-7624